Docket Nos. 90770, 90841 cons.–Agenda 29–September 2001.

VERNON SCHULTZ, Appellant, v. NORTHEAST ILLINOIS REGIONAL COMMUTER RAILROAD CORPORATION, d/b/a/

 Metra, Appellee.

Opinion filed June 6, 2002.

JUSTICE GARMAN delivered the opinion of the court:

Plaintiff, Vernon Schultz, filed a complaint against defendant, Northeast Illinois Regional Commuter Railroad Corporation, doing business as Metra, pursuant to the Federal Employers’ Liability Act (FELA) (45 U.S.C. §51 
et seq
. (1994)), for injuries he allegedly sustained while employed as a switch foreman for defendant. The purpose of FELA is to provide a remedy to railroad employees for injuries and death resulting from accidents on interstate railroads. 45 U.S.C. §51 (1994). Plaintiff alleged that he was seriously injured while performing his duties when he fell off a retaining wall at defendant’s 47th Street Yard in Chicago. After trial, the jury returned a verdict of $800,000, which was reduced to $400,000 upon a finding of 50% contributory negligence. Both parties appealed. The appellate court affirmed in part and reversed in part. Nos. 1–99–3596, 1–99–3647 cons. (unpublished order under Supreme Court Rule 23). The parties subsequently filed petitions for leave to appeal with this court. We granted both petitions (177 Ill. 2d R. 315(a)) and consolidated the cases on appeal.

BACKGROUND

Undisputed facts indicate that at its 47th Street Yard, defendant services commuter trains operating on its Rock Island line, which runs from the La Salle Street Station in Chicago to Joliet. Double mainline tracks running north-south are located to the east of the yard along with two yard lead tracks, the long lead and short lead. A building known as the “Rocket House,” where employees service and repair locomotives, is situated at the northwest end of the yard, and a concrete retaining wall, adjacent to the Rocket House, separates an upper yard from a lower yard. The retaining wall is approximately 6½ feet high at the southeast corner of the Rocket House. The building’s main entrance is located in the lower yard, and a second door is located on the east side of the building in the upper yard. The area between the tracks and the Rocket House is a flat surface covered by crushed limestone.

At trial, plaintiff testified that he began working for railroads in 1960 and had always performed switch work. On February 15, 1994, while employed by defendant, he was the foreman of a three-man crew that included Mark Essary and Tom Miller. After the morning rush hour, the crew disconnected two passenger trains at the La Salle Street Station, left a few cab cars from each train at the station, doubled the remaining cars and rode them southbound to the 47th Street Yard for washing and servicing. Essary and Miller rode on the locomotive, while plaintiff rode in the last cab car.

Plaintiff stated that it was his typical practice to alight from the train when it passed the east door to the Rocket House, while the other crew members took the train into the 47th Street Yard. He would enter the Rocket House from the east door, which was normally propped open for him, but on February 15, 1994, after noticing that the door was locked, he remained on the train and alighted at the south end of the Rocket House. When he exited the train he was “snowblinded” and reached for his photograde sunglasses. After putting on his sunglasses, plaintiff walked another eight or nine feet when he heard a noise he thought was a train. As he turned to look back, plaintiff walked off the top of the retaining wall near the southeast corner of the Rocket House, allegedly injuring his back, toe, and left knee.

Immediately after his fall, plaintiff reported the incident to the Rocket House superintendent and filed an incident report. He was taken by one of defendant’s employees to Dr. Barry Fischer’s office at the U.S. Occupational Health Clinic. Plaintiff did not return to work until July 20, 1994, and was again taken off duty by Dr. Fischer in May 1995. After a one-month absence, plaintiff returned to work, and continued to work, with restrictions, until January 5, 1996. On April 2, 1996, plaintiff failed defendant’s biennial physical examination upon which Dr. Fischer disqualified him from performing his duties. On July 30, 1996, plaintiff had total knee replacement surgery. He never returned to work for defendant.

Plaintiff also indicated that he injured his left knee in 1990 while climbing on rocks and hills but maintained that his left knee and leg had not created problems for him prior to the accident. He denied walking with a limp prior to the accident and noted that he had passed defendant’s biennial physical examination in 1992. On cross-examination, plaintiff admitted that, in a medical history report prepared for his 1990 physical exam, he indicated that he experienced pain and locking in his left knee and pain in the left side of his lower back.

Plaintiff called Dennis Mogan, defendant’s director of safety and rules, as an adverse witness. Mogan testified that he is responsible for the safety of defendant’s 2,500 employees and part of his job is to remedy unsafe conditions. He testified that he has been to the 47th Street Yard on several occasions to perform safety audits and crew observation and is familiar with the Rocket House and the retaining wall. Mogan admitted that an unprotected height can be hazardous and acknowledged that, prior to February 15, 1994, the retaining wall had no guardrail. Although he admitted that plaintiff’s fall would most likely have been prevented by a guardrail, he indicated that the “walkway” by the retaining wall is not a “work area.” He stated that the walkway can be used by trainmen and maintenance employees, but its use is unnecessary, as employees can walk on the other side of the tracks and, in any event, do not have to walk near the retaining wall. Mogan, however, further stated that he would not be surprised to learn that trainmen walked in the area near the retaining wall in the course of their everyday duties.

According to Mogan, no employee had reported safety concerns to him regarding the retaining wall and no accidents in the area had been reported. He testified that, in the course of his safety audits, he noticed and corrected many hazards in and around the Rocket House. Because of the obvious difference in elevation, Mogan never considered the need for a guardrail above the retaining wall.

Dr. David Smith testified by evidence deposition that he first met with plaintiff on March 16, 1994. On that date, he reviewed an MRI that revealed a tear of the medial meniscus, or cartilage, in plaintiff’s left knee, and degenerative arthritis, also known as osteoarthritis, in all three components of his left knee. Smith noted that the osteoarthritis preexisted plaintiff’s fall but opined that despite the preexisting condition, plaintiff’s fall at least irritated or inflamed the knee and led to his chronic knee problems. Smith admitted that his opinion could change if he knew that plaintiff was symptomatic prior to the accident. He further acknowledged that a thinning and tearing of the medial meniscus could be caused by a degenerative process.

Smith performed an arthroscopy of plaintiff’s left knee on April 5, 1994. At that time, he determined that plaintiff’s osteoarthritis was “grade 5,” the most severe form, there was a softening of the cartilage under the kneecap, and the lining of the knee joint was inflamed. Smith performed a second arthroscopic procedure on January 11, 1996, at which time he observed that plaintiff’s degenerative condition had progressed from the time of the first arthroscopy. This led to a total knee replacement on July 30, 1996. Smith testified that it is not unusual for patients to return to work after knee replacements and plaintiff is capable of sedentary or light-duty work.

Jonathan Crane, an economist, analyzed plaintiff’s earning loss. Under his most conservative estimate, he concluded that plaintiff lost $341,000 in earnings, and under his least conservative estimate, plaintiff lost $432,500 in earnings, resulting in an average of $386,000.

Prior to trial, plaintiff disclosed his intention to call Eugene Holland, a structural engineer, as an expert witness to testify, in part, that defendant violated certain sections of the Occupational Safety and Health Act (OSHA) (29 U.S.C. §651 
et seq.
 (1994)) and the Chicago Building Code (Code). Defendant filed a motion 
in limine 
to “exclude any reference to OSHA at trial,” arguing that the Federal Railroad Administration (FRA) preempted OSHA regulations in the area of walkways and working surfaces beside tracks in railroad yards. Further, defendant argued that OSHA and the Code do not, by their own terms, regulate the area of the retaining wall. The trial court agreed and granted defendant’s motion 
in limine
. Based on this holding, the court also denied plaintiff’s motion 
in limine
 to bar defendant from asserting the defense of contributory negligence. The trial court, however, reserved ruling on whether Holland could testify that OSHA and the Code indicated defendant’s standard of care.

At trial, Holland testified that he consults various parties in the construction industry on the construction process, design, and construction safety and, for this case, he had reviewed depositions and legal documents and had conducted a thorough site inspection of the area of plaintiff’s injury. Holland stated that he is a member of several organizations including the American Society of Civil Engineers, the American Society of Safety Engineers, the American Concrete Institute, the American Institute of Steel Construction, the Structural Engineers’ Association of Illinois, BOCA, and the American National Standards Institute (ANSI), all of which promulgate safety standards. He is also familiar with the safety standards promulgated in OSHA and the Code.

Holland concluded that “every safety standard *** recognizes a change of level as being a fault” and the area above the retaining wall is a work area and an unprotected fall hazard. Plaintiff’s counsel then asked Holland whether he believed defendant should have installed a guardrail on the retaining wall. Defense counsel objected to the question, arguing that Holland had never stated an opinion on the issue prior to trial. The court sustained defendant’s objection. Plaintiff’s counsel rephrased the question to the court’s satisfaction, and the following dialogue ensued:

“MR. BRUGESS [plaintiff’s attorney]: Mr. Holland, do you have an opinion within a reasonable degree of engineering and safety certainty whether or not that retaining wall as it existed on February 15, 1994, constituted a safety hazard?

A. Yes.

MR. SIKES [defendant’s attorney]: Objection for the record.

THE COURT: So noted for the record.

MR. BRUGESS: What is that opinion?

A. Because it was a fall hazard. There was a change of level.

Q. And you told us a little bit about some of these safety standards that are out there, ANSI, BOCA, building codes, OSHA regulations. If one were to look at those types of standards and–let me ask it first. Do any or all of these standards deal with unprotected fall hazards?

A. Yes, all of them.

Q. If one were to look at those types of standards, what would they say about unprotected fall hazards?

A. You need a guardrail when you have a change in elevation, and they spell out the guardrail sizing, heights, and all of the requirements in order to provide it.”

Holland further testified that it would take only a visual inspection of the area to realize that an employee could fall off the retaining wall.

Defendant presented the following testimony. First, Michael K. Bennett, defendant’s senior manager of communications, testified that prior to February 15, 1994, he had daily contact with plaintiff at the La Salle Street Station and had noticed that plaintiff always walked with a limp. Thomas Miller, plaintiff’s crew member, also testified that prior to plaintiff’s accident, plaintiff walked with a limp. However, defendant’s employee Ken Malloy testified that, prior to February 1994, he had worked with plaintiff and had not observed any physical disability, although Malloy did notice that plaintiff walked bowlegged.

Beth Birkenfeld, a conductor, testified that prior to February 15, 1994, plaintiff “made it very clear” to her that she had to perform the physical work while he backed her up.

Kevin King, also a conductor, testified that he had worked as plaintiff’s helper several times. He stated that plaintiff rarely missed a day of work prior to his accident and had performed his job “very, very well”; however, after the fall, plaintiff had a “real tough time” completing his work. King could not recall making an alleged statement to defense counsel that, prior to February 15, 1994, plaintiff had a “slow manner” of walking.

Ingrid Dillon, a physical therapist, testified that on September 4, 1997, she performed a functional-capacity evaluation of plaintiff, which included a review of plaintiff’s medical records, job description, and physical tests. She concluded that plaintiff was incapable of performing the job of switch worker due to lower-back and knee pain, and, due to lower-back pain, plaintiff was incapable of throwing a switch. Dillon stated that plaintiff could return to a job with a medium physical demand level.

Dr. Philip FitzSimons, a board-certified orthopedic surgeon, after reviewing plaintiff’s medical records and depositions taken in the case, concluded that plaintiff suffered from osteoarthritis in his left knee prior to February 15, 1994. FitzSimons testified that an MRI conducted approximately three weeks after plaintiff’s injury revealed moderately severe to severe arthritis in all three compartments of the knee. He opined that plaintiff’s work injury did not “make his arthritis accelerate any faster, *** the arthritis was inevitably going to progress based on findings at the first arthroscopy, and [the] injury may have made his knee sore but it certainly did not produce the arthritis nor *** speed up the arthritis.” According to FitzSimons, it was plaintiff’s preexisting arthritic condition that led to his eventual total knee replacement surgery.

FitzSimons further testified that an MRI performed in May 1995 revealed degenerative disc disease and a general wearing and tearing of the lumbar discs, and opined that plaintiff’s back problems were not caused by the accident. He indicated that plaintiff could return to a job requiring medium functional activity.

At the close of trial, over defendant’s objection, the court tendered Illinois Pattern Jury Instruction 30.21 (Illinois Pattern Jury Instructions, Civil, No. 30.21 (1995) (hereinafter IPI Civil 1995 No. 30.21)), regarding damages for an injury resulting from the aggravation of a preexisting condition. The court rejected both of defendant’s suggested alternatives to IPI Civil 1995 No. 30.21. Also over defendant’s objection, the court allegedly instructed the jury that assumption of risk is not a defense.
(footnote: 1) Finally, the court declined to instruct the jury, pursuant to defendant’s request, that defendant is not an insurer of plaintiff’s safety.

The jury returned a verdict, without considering plaintiff’s contributory negligence, in the amount of $800,000, itemized as follows: $250,000 for disability; $250,000 for pain and suffering; $0 for disfigurement resulting from the injury; $300,000 for present and future earnings lost. The jury further found plaintiff 50% responsible for his injuries and reduced the judgment to $400,000. Both parties filed timely post-trial motions.

The appellate court “affirmed in part and reversed in part.” Although the court indicated that it was reversing the trial court’s judgment in part, rather, it simply disagreed with the trial court’s reasoning as to one issue and ultimately affirmed the trial court’s judgment (see 
People v. Speed
, 315 Ill. App. 3d 511, 517 (2000) (the trial court’s judgment may be affirmed on any basis supported by the record)).

ANALYSIS

I. Jury Instructions

A. 
Aggravation of Preexisting Condition

Defendant first contends that the trial court erred by instructing the jury pursuant to IPI Civil 1995 No. 30.21:

“If you decide for the plaintiff on the question of liability, you may not deny or limit the plaintiff’s right to damages resulting from this occurrence because any injury resulted from an aggravation of a pre-existing condition or a pre-existing condition which rendered the plaintiff more susceptible to injury.” IPI Civil 1995 No. 30.21.

According to defendant, the instruction is in direct conflict with federal substantive law applicable in FELA cases, which mandates that damages be limited to those resulting from an aggravation of a preexisting condition. Defendant proposed the following nonpattern instructions as alternatives to IPI Civil 1995 No. 30.21:

“If you find that the plaintiff’s injury was due in part to a pre-existing condition and in part to defendant’s aggravation of that pre-existing condition, you must determine how much of the plaintiff’s injury was due to his pre-existing condition and how much of the plaintiff’s present injury is the result of defendant’s aggravation of his pre-existing condition. Defendant can only be held responsible for that portion of plaintiff’s injury that is the result of defendant’s aggravation of his pre-existing condition.” Defendant’s Instruction No. 29.

“As to the aggravation of [a] preexisting condition, if you find in favor of plaintiff on the issue of liability, Metra is liable for damages, both temporal and permanent, caused by the aggravation of the condition, but not for losses which would have resulted from the preexisting condition even if the accident had not occurred.” Defendant’s Instruction No. 34.

A trial court is required to use an Illinois Pattern Jury Instruction when it is applicable in a civil case after giving due consideration to the facts and the prevailing law, unless the court determines that the instruction does not accurately state the law. 177 Ill. 2d R. 239(a); 
Hobart v. Shin
, 185 Ill. 2d 283, 294 (1998). If the pattern instruction does not accurately state the law, the court may instruct the jury pursuant to a nonpattern instruction. 
Hobart
, 185 Ill. 2d at 294. The trial court has discretion to determine which instructions to give the jury and that determination will not be disturbed absent an abuse of that discretion. 
People v. Simms
, 192 Ill. 2d 348, 412 (2000); 
In re Nancy M.
, 317 Ill. App. 3d 167, 173 (2000). The standard for deciding whether a trial court abused its discretion is whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles. 
Palmer v. Mount Vernon Township High School District 201
, 269 Ill. App. 3d 1056, 1062 (1995). A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant. 
Sinclair v. Berlin
, 325 Ill. App. 3d 458, 464 (2001).

First, we must determine whether IPI Civil 1995 No. 30.21 accurately states the law to be applied in the instant case regarding the aggravation of a preexisting condition. Generally, a FELA action brought in state court is governed by state procedural law and federal substantive law. 
St. Louis Southwestern Ry. Co. v. Dickerson
, 470 U.S. 409, 411, 84 L. Ed. 2d 303, 306, 105 S. Ct. 1347, 1348 (1985); 
Noakes v. National R.R. Passenger Corp
., 312 Ill. App. 3d 965, 967 (2000); 
Gibbs v. Lewis & Clark Marine, Inc
., 298 Ill. App. 3d 743, 748 (1998). In 
Dickerson
, the Supreme Court noted that “it is settled that the propriety of jury instructions concerning the measure of damages in an FELA action is an issue of ‘substance’ determined by federal law.” 
Dickerson
, 470 U.S. at 411, 84 L. Ed. 2d at 306, 105 S. Ct. at 1348, citing 
Norfolk & Western Ry. Co. v. Liepelt
, 444 U.S. 490, 493, 62 L. Ed. 2d 689, 693, 100 S. Ct. 755, 757 (1980). See also 
Argueta v. Baltimore & Ohio Chicago Terminal R.R. Co.
, 224 Ill. App. 3d 11, 18 (1991); 
Pryor v. National R.R. Passenger Corp
., 301 Ill. App. 3d 628, 633 (1998) (in an FELA case, the substance contained in jury instructions is governed by federal law while the instructional format is procedural and is a matter for the state to regulate). Thus, the proper content of jury instructions regarding damages for an injury resulting from the aggravation of a preexisting condition, is determined by federal law.

In 
Sauer v. Burlington Northern R.R. Co.
, 106 F.3d 1490 (10th Cir. 1997), the plaintiff filed suit under FELA claiming that he was injured on two separate occasions while working for the railroad. The evidence established that the plaintiff had a preexisting degenerative condition in his back that made him more susceptible to injury. The district court instructed the jury as follows on aggravation of a preexisting condition:

“ ‘If you find for the Plaintiff, you should compensate him for any aggravation of an existing disease or physical defect resulting from such injury. If you find that there was an aggravation, you should determine, if you can, what portion of the Plaintiff’s condition resulted from the aggravation and make allowance in your verdict only for the aggravation. However, if you cannot make that determination or if it cannot be said that the condition would have existed apart from the injury, you should consider and make allowance in your verdict for the entire condition.’ ” 
Sauer
, 106 F.3d at 1494.

The jury found the railroad not negligent in the plaintiff’s first accident, but determined that both parties were equally at fault in the subsequent accident. The jury attributed 75% of the plaintiff’s injuries to preexisting conditions and reduced his damages accordingly. 
Sauer
, 106 F.3d at 1493. On appeal, the Tenth Circuit quoted the apportionment instruction with approval, noting that sufficient evidence supported the instruction. 
Sauer
, 106 F.3d at 1494-95. Further, the court held that the jury was properly instructed to reduce the plaintiff’s damages by the likelihood that he would have suffered the injury even if the accident had not occurred. 
Sauer
, 106 F.3d at 1495. Following the Tenth Circuit decision, a federal pattern jury instruction substantially similar to the instruction given in 
Sauer
 arose on aggravation of a preexisting condition. See Federal Jury Practice & Instructions, Civil, No. 155.65 (5th ed. 2001).

In 
Stevens v. Bangor & Aroostook R.R. Co.
, 97 F.3d 594 (1st Cir. 1996), also an FELA case, evidence was presented at trial that the plaintiff suffered from degenerative disc disease prior to his employment-related accident. The plaintiff, however, presented expert testimony that the accident caused an aggravation of his preexisting condition. The trial court gave the following instruction:

“There is evidence in this case that plaintiff had a pre-existing injury or condition which existed prior to February 19, 1994. The railroad is only liable for damages you find to be caused by the occurrence of February 19, 1994. If you find that plaintiff’s pre-existing condition made him more susceptible to injury than a person in good health, the defendant is responsible for all injuries suffered by the plaintiff as a result of the defendant’s negligence, even if those injuries are greater than would have been suffered by a person in good health under the same circumstances.

If you find that defendant negligently caused further injury or aggravation to plaintiff’s pre-existing condition, plaintiff is entitled to compensation for all of plaintiff’s damages caused by the incident, including that further injury or aggravation. If you cannot separate the pain or disability caused by the pre-existing condition from that caused by the occurrence of February 19, 1994, then the defendant is liable for all of plaintiff’s injuries.” 
Stevens
, 97 F.3d at 601.

The court concluded that the instruction correctly stated the law and, “as a general matter, when a defendant’s negligence aggravates a plaintiff’s pre-existing health condition, the defendant is liable only for the additional increment caused by the negligence and not for the pain and impairment that the plaintiff would have suffered even if the accident had never occurred.” 
Stevens
, 97 F.3d at 601. See also 
Varhol v. National R.R. Passenger Corp.
, 909 F.2d 1557, 1564-65 (7th Cir. 1990) (upholding the use of special interrogatories in conjunction with an apportionment instruction allowing damages only for the aggravation of a preexisting condition upon a finding that aggravation exists); 
Wise v. Union Pacific R.R. Co.
, 815 F.2d 55, 58 (8th Cir. 1987) (quoting with approval instruction stating that railroad is liable for pain or disability jury finds to be caused by the plaintiff’s accident and that if it cannot separate the pain or disability caused by the preexisting condition from that caused by the accident, the railroad is liable for all of the pain or disability); 
Boyt v. Grand Trunk Western R.R.
, 233 Mich. App. 179, 186, 592 N.W.2d 426, 431 (1999) (trial court properly instructed jury according to federal law that if it found the injury to be an aggravation of a preexisting condition, it must attempt to determine what portion of the condition resulted from the aggravation, and award damages only for the aggravation).

Accordingly, in FELA cases, if sufficient evidence exists to indicate that an injury may have resulted from the aggravation of a preexisting condition, the jury should be instructed that if it finds for the plaintiff on the issue of liability, it should award damages only for the aggravation of the plaintiff’s preexisting condition. We turn now to whether the jury was so instructed in the case at bar.

The appellate court held that IPI Civil 1995 No. 30.21 was “in tune” with federal substantive law because it “only addresses damages ‘which result from’ the accident, including those which aggravate pre-existing injuries, and nothing more.” The court noted that defendant’s instructions in the case at bar, similar to those rejected in 
Pruett v. Norfolk & Western Ry. Co.
, 261 Ill. App. 3d 29 (1994), attempted to stress to the jury that it may not award damages for an injury or condition that existed or which would have resulted if the accident had not occurred. The court determined that defendant’s proposed instructions would have only confused the otherwise clear pattern instruction. We disagree. Several Illinois cases have discussed the propriety of IPI Civil No. 30.21 in FELA cases. See 
Pruett
, 261 Ill. App. 3d 29; 
Worthy v. Norfolk & Western Ry. Co.
, 249 Ill App. 3d 1096 (1993); 
Ficken v. Alton & Southern Ry. Co.
, 255 Ill. App. 3d 1047 (1993); 
Grimming v. Alton & Southern Ry. Co.
, 204 Ill. App. 3d 961 (1990). In 
Worthy
, evidence was introduced at trial that the railway’s negligence aggravated the plaintiff’s preexisting knee and back conditions. The trial court gave plaintiff’s instruction number eight, a slightly modified version of IPI Civil No. 30.21, and plaintiff’s instruction number one, which instructed the jury that the plaintiff had the burden of proving that he was injured and that the defendant’s negligence caused his injuries “ ‘in whole or in part.’ ” 
Worthy
, 249 Ill. App. 3d at 1100-01. The court refused two nonpattern instructions suggested by the railway which were similar to defendant’s numbers 29 and 34 in the present case. The railway argued that the court’s refusal to give its nonpattern instructions along with the giving of plaintiff’s instructions one and eight allowed the plaintiff’s counsel to make improper and inflammatory argument to the jury regarding what to consider when awarding damages. 
Worthy
, 249 Ill. App. 3d at 1101. The appellate court noted that IPI Civil No. 30.21 was promulgated in response to this court’s decision in 
Balestri v. Terminal Freight Cooperative Ass’n
, 76 Ill. 2d 451 (1979), and was an accurate statement of the law regarding the aggravation of a preexisting condition. 
Worthy
, 249 Ill. App. 3d at 1101-02. In concluding that the trial court did not err, the appellate court rejected the notion that the pattern instructions allowed the plaintiff to argue that he should be compensated for his preexisting condition or directed the jury to compensate the plaintiff for that condition. 
Worthy
, 249 Ill. App. 3d at 1102.

In 
Pruett
, the jury was instructed pursuant to IPI Civil No. 30.21. The trial court rejected the defendant’s alternatives, one of which instructed the jury that it should not consider any pecuniary loss caused by the plaintiff’s preexisting condition which would have resulted independently of the accident, and if it found all damages attributable solely to the progression of the plaintiff’s preexisting condition, it should return a verdict in favor of the defendant. Although structured in a different way, the defendant’s proposed alternate in 
Pruett
 essentially said the same thing as defendant’s suggested instructions in this case–a plaintiff cannot be compensated for the preexisting condition itself, but will be compensated for the aggravation of the preexisting condition. The court held that IPI Civil No. 30.21 accurately stated the law on aggravation of a preexisting condition and the defendant’s proposed instructions, which misstated the law, could be construed as contrary to IPI Civil No. 30.21. 
Pruett
, 261 Ill. App. 3d at 36. Also citing 
Balestri
, the court noted that “our supreme court disapproved as contrary to law, a jury instruction that ‘failed to instruct the jury that the damages assessed should not be reduced because the disability was due in part to a preexisting condition or for the reason that plaintiff, because of a preexisting condition, was more susceptible to injury than an individual would have been without the preexisting condition.’ ” 
Pruett
, 261 Ill. App. 3d at 36-37, quoting 
Balestri
, 76 Ill. 2d at 456. The court found no error by the trial court in giving IPI Civil No. 30.21 and refusing defendant’s tendered instructions. 
Pruett
, 261 Ill. App. 3d at 37.

Balestri
 was not an FELA case. Defendant correctly notes that in FELA cases, the appellate court has failed to apply federal substantive law to jury instructions concerning the measure of damages. Under federal law, the trial court should instruct the jury that if it finds for the plaintiff and finds that there was a preexisting condition, it should award damages only for the aggravation of that condition that was caused by the defendant’s negligence. Although the appellate court here apparently recognized the application of federal substantive law, the court erred in concluding that IPI Civil 1995 No. 30.21 adequately instructed the jury.

IPI Civil 1995 No. 30.21 instructs the jury that “[it] may not deny or limit the plaintiff’s right to damages resulting from this occurrence because any injury resulted from an aggravation of a pre-existing condition or a pre-existing condition which rendered the plaintiff more susceptible to injury.” Plaintiff argues that the pattern instruction is proper because it states that he can recover 
only
 for “damages resulting from this occurrence.” IPI Civil 1995 No. 30.21 does not so instruct the jury. Instead, it tells the jury that it “may not deny or limit” damages “resulting from this occurrence” simply because the plaintiff has a preexisting condition. Although not directly contrary to federal law, the pattern instruction does not clearly inform the jury that damages should be awarded 
only
 for the aggravation of a preexisting condition. Jury instructions should not be misleading or confusing. See 
People v. Pinkney
, 322 Ill. App. 3d 707, 717 (2000). IPI Civil 1995 No. 30.21 is misleading in that it appears to instruct the jury that damages should not be denied or limited 
in any way
 if the injury resulted from the aggravation of a preexisting condition. A jury is unlikely to read the phrase “resulting from this occurrence” as a limitation. See 
Reivitz v. Chicago Rapid Transit Co.
, 327 Ill. 207, 213 (1927) (the test of the correctness of an instruction is not what meaning the ingenuity of counsel can attribute to it, but how and in what sense, under the evidence before them and the circumstances of the trial, ordinary persons acting as jurors will understand the instruction); see also 
People v. Lozada
, 211 Ill. App. 3d 817, 822 (1991); 
Nicholl v. Scaletta
, 104 Ill. App. 3d 642, 647 (1982). As such, it is unclear from the instruction whether the jury should compensate the plaintiff for the preexisting condition itself.

Unlike IPI Civil 1995 No. 30.21, defendant’s proposed instructions clearly and accurately state the law to be applied in FELA cases. Further, there was ample evidence to support the giving of one of defendant’s proposed instructions. Dr. FitzSimons testified that plaintiff’s back and knee problems were not caused by his work-related accident but, rather, they were a result of plaintiff’s degenerative disc disease and osteoarthritis. In addition, he testified that plaintiff’s arthritis would have progressed even if the accident had not occurred. Plaintiff’s own expert, Dr. Smith, also testified that the osteoarthritis preexisted the accident; however, he concluded that plaintiff’s accident at least irritated or inflamed his knee. Further, several witnesses observed plaintiff limping or walking bowlegged before the accident, and plaintiff admitted that he had injured his back and left knee prior to the accident.

We conclude that the trial court erred in giving IPI Civil 1995 No. 30.21. The court should have instructed the jury pursuant to either defendant’s Nos. 29 or 34. Nonetheless, we hold that the trial court’s failure to so instruct the jury is not reversible error. We note that an appellate court’s judgment may be affirmed on any basis in the record. 
Speed
, 315 Ill. App. 3d at 517; 
People v. Collins
, 214 Ill. App. 3d 98, 104 (1991). It is not clear from the record that the jury was misled by the error. In addition to IPI Civil 1995 No. 30.21, the jury was given the following instruction: “If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate him for any of the following elements of damages 
proved by the evidence
 
to have resulted from the negligence of the defendant
, taking into consideration the nature, extent and duration of the injury ***.” Further, if defendant was concerned about jury confusion, it could have offered a verdict form that required the jury to specify the amount of damages awarded for aggravation of a preexisting condition. 
Cf.
 
Moore v. Jewel Tea Co.
, 46 Ill. 2d 288, 294 (1970) (defendants could have submitted a separate verdict form to determine the count or counts upon which the jury returned its verdict and could not seek to benefit from their failure). Here, defendant failed to offer such an itemized form. Instead, the jury concluded that plaintiff suffered $800,000 in damages: $250,000 for disability resulting from the injury; $250,000 for pain and suffering; $0 for disfigurement resulting from the injury; $300,000 for value of earnings lost and the present cash value of earnings reasonably certain to be lost in the future.

Finally, in refusing defendant’s nonpattern alternatives to IPI Civil 1995 No. 30.21, the trial court allowed defense counsel to discuss in closing argument the evidence established by the doctors regarding plaintiff’s preexisting condition and that plaintiff’s injury would have resulted even if the accident had not occurred. In his closing argument, defense counsel, in fact, emphasized the evidence regarding plaintiff’s preexisting condition in approximately seven pages of argument. Counsel further emphasized to the jury that “[o]ne of the instructions will be that you must reasonably and fairly compensate Mr. Schultz for damages, here are the important words, [‘p]roved by the evidence to have resulted from the conduct of Metra.[’] [‘]Proved by the evidence to have resulted.[’] ” Later, defense counsel specifically told the jury that it could not award damages for losses which would have resulted from plaintiff’s preexisting condition, even if the accident had not occurred.

We conclude that the erroneous giving of IPI Civil 1995 No. 30.21 and the failure to give one of defendant’s proposed alternatives does not constitute reversible error here.

B. 
Assumption of Risk

Defendant next argues that the trial court abused its discretion in instructing the jury on assumption of risk. If submitted, the alleged instruction, using statutory language, essentially told the jury that assumption of risk is not a defense in an FELA case. The court also instructed the jury that if it found plaintiff guilty of contributory negligence, it must reduce plaintiff’s damages accordingly. There is some overlap between the doctrines of assumption of risk and contributory negligence; however, the defenses are not interchangeable. 
Taylor v. Burlington Northern R.R. Co.
, 787 F.2d 1309, 1316 (9th Cir. 1986). Assumption of risk is “an employee’s voluntary, knowledgeable acceptance of a dangerous condition that is necessary for him to perform his duties,” while contributory negligence is a “careless act or omission on the plaintiff’s part tending to add new dangers to conditions that the employer negligently created or permitted to exist.” 
Taylor
, 787 F.2d 1316.

FELA expressly eradicated the common law defense of assumption of risk. 45 U.S.C. §53 (1994); see 
Tiller v. Atlantic Coast Line R.R. Co.
, 318 U.S. 54, 58, 87 L. Ed. 610, 613, 63 S. Ct. 444, 446-47 (1943). The giving of an instruction on assumption of risk in a case where the “defense” has been neither pleaded nor argued has been condemned by several courts as “a confusing, negative statement which refers to issues not involved in an FELA case.” 
Heater v. Chesapeake & Ohio Ry. Co.
, 497 F.2d 1243, 1249 (7th Cir. 1974). See also 
DeChico v. Metro-North Commuter R.R.
, 758 F.2d 856, 861 (2d Cir. 1985); 
Casko v. Elgin, Joliet & Eastern Ry. Co.
, 361 F.2d 748, 751 (7th Cir. 1966); 
Seaboldt v. Pennsylvania R.R. Co.
, 290 F.2d 296, 300 (3d Cir. 1961).

The appellate court concluded that the issue of assumption of risk was “implicitly or otherwise” before the jury in this case; therefore, the trial court did not abuse its discretion in instructing the jury to disregard the assumption of risk defense. Defendant, however, maintains that the evidence and argument at trial were directed to the issue of contributory negligence rather than assumption of risk, and that defendant was prejudiced by the erroneous instruction because “the jury could have found plaintiff more or solely at fault for his injuries, had it not been confused with the concept of assumption of risk.”

Defendant fails to cite a case in which the giving of an assumption of risk instruction in an FELA case was held to be reversible error. See 
Clark v. Burlington Northern, Inc.
, 726 F.2d 448, 452 (8th Cir. 1984); 
Heater
, 497 F.2d at 1249 (found no case in which the giving of the instruction in an FELA case was alone held to be reversible error). It is within the discretion of the trial court to determine whether, based on the evidence, an instruction is applicable and should be given. 
Hobart
, 185 Ill. 2d at 294. Even if the giving of the instruction was erroneous, the jury still found plaintiff 50% at fault. This comports with the evidence and indicates that the jury was not confused by the alleged instruction. See 
Clark
, 726 F.2d at 452. Therefore, we conclude that if the assumption of risk instruction was submitted to the jury, it does not rise to the level of reversible error.

C. 
Insurer of Safety

Last, with respect to jury instructions, defendant argues that the trial court erred in refusing to instruct the jury that defendant is not an insurer of plaintiff’s safety. Defendant maintains that the instruction was necessary due to evidence introduced at trial. During cross-examination, plaintiff’s counsel questioned Dennis Mogan regarding his identification of an unprotected fall hazard 
inside
 the Rocket House and his order to construct a guardrail around the area:

“Q. Was that to insure the employees’ safety?

A. That was to protect what was categorized as a work area, yes.

Q. Okay. Was that to insure the employees’ safety?

A. Yes.

Q. Did you testify earlier that, and I quote, Metra does everything possible to assure employee safety?

A. Yes.

Q. Wouldn’t a railing [above the retaining wall] have assured Mr. Schultz’s safety on February 14 of 1995?

A. It could have.”

Later, plaintiff’s counsel posed the following question:

“Q. If you wanted to insure Metra’s employees’ safety at this location, you would put a guardrail up, isn’t that true?

MR. SIKES [Defense attorney]: Judge, I object.

THE COURT: Answer the question, sir. I indicated to you earlier that Mr. Sikes will have an opportunity to reexamine you.

A. Yes.

MR. BRUGESS [Plaintiff’s attorney]: Yes, you would put a guardrail up there?

A. Yes.”

Based on this testimony, defendant offered the following nonpattern instruction:

“The law does not make the defendant-railroad company an insurer of the safety of its employees, nor of the safety of the places in which they work. Defendant is bound only to exercise the care which the particular circumstances reasonably demand. The basis of defendant’s liability, if any, is negligence, and not the mere fact that an injury occurs while plaintiff is working. Moreover, that negligence must, in whole or in part, cause the injury, or plaintiff may not recover.”

Defendant states that liability under FELA is based on negligence and not the mere fact that an injury occurs. See 45 U.S.C. §51 (1994). Defendant argues that plaintiff’s cross-examination of Mogan interjected an inappropriate standard of care and its tendered instruction was necessary to inform the jury of the proper standard of care.

We agree with the appellate court that Illinois Pattern Jury Instruction, Civil, No. 10.04 (1995) (hereinafter IPI Civil 1995 No. 10.04) adequately and correctly stated the standard of care to be applied in FELA cases: “It was the duty of the defendant, before and at the time of the occurrence, to use ordinary care for the safety of the plaintiff. That means it was the duty of the defendant to be free from negligence.” IPI Civil 1995 No. 10.04. The trial court further instructed the jury on the definition of negligence: “When I use the word ‘negligence’ in these instructions, I mean the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do, under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide.” IPI Civil 1995 No. 10.01. As previously stated, the trial court must use a pattern instruction when it is applicable and accurately states the law. 177 Ill. 2d R. 239(a); 
Hobart
, 185 Ill. 2d at 294. The trial court does not abuse its discretion by refusing to give a nonpattern instruction if an appropriate pattern instruction exists. 
Simms
, 192 Ill. 2d at 412. Here, the jury was correctly and adequately instructed on the appropriate standard of care. The trial court’s refusal to give defendant’s nonpattern instruction was not an abuse of discretion.

II. Reduction for Contributory Negligence

FELA provides for the reduction of damages when an employee is contributorily negligent “
[p]rovided
, [t]hat no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.” (Emphasis in original.) 45 U.S.C. §53 (1994). On cross-appeal, plaintiff argues that defendant violated standard 1910.23(c) of OSHA (29 C.F.R. §1910.23(c) (1993)), a “statute enacted for the safety of employees,” when it failed to install a guardrail above the retaining wall. Therefore, plaintiff maintains that the trial court erred by reducing his damages based on contributory negligence. Defendant, however, responds initially that OSHA standards do not regulate the area above the retaining wall and, even if they do apply, the FRA has preempted OSHA regulations in that area. Further, defendant maintains that even if it committed an OSHA violation, OSHA is not a safety statute contemplated by section 53 of FELA; therefore, plaintiff’s damages were properly reduced by his contributory negligence.

The trial court agreed with defendant, determining, as a matter of law, that OSHA regulations do not apply to the area of the retaining wall and, even if the regulations are applicable, they are preempted by the FRA. Based on these conclusions, the trial court denied plaintiff’s motion to bar consideration of contributory negligence.

The appellate court disagreed, concluding that the “upper level area near the retaining wall” is a “platform” under standard 1910.23(c)(1), and implicitly determined that defendant violated OSHA by failing to install a guardrail on the open side of the “platform.” The appellate court also held that the FRA did not preempt OSHA in this area because the FRA had not exercised its authority “over the top of the retaining wall from which plaintiff fell.” However, the court determined that OSHA is not a “statute enacted for the safety of employees”; therefore, evidence of an OSHA violation does not constitute negligence 
per se
. As such, the portion of section 53 which prohibits evidence of employee contributory negligence had not been triggered.

Initially, defendant suggests that plaintiff should be barred from raising the issue of an OSHA violation on appeal because he failed to allege an OSHA violation in his complaint pursuant to Supreme Court Rule 133(a). Under Rule 133(a), “[i]f a breach of statutory duty is alleged, the statute shall be cited in connection with the allegation.” 134 Ill. 2d R. 133(a). While it is true that plaintiff did not cite OSHA in his complaint, plaintiff was not permitted to argue at trial that defendant violated OSHA. In any event, the purpose of Rule 133(a) is to provide the opposing party with notice of the allegation of a breach of statutory duty. Defendant had ample notice through the report and deposition of Eugene Holland, and through plaintiff’s response to its affirmative defense of contributory negligence, that plaintiff would attempt to prove that defendant violated OSHA.

Defendant also argues that this issue is waived because plaintiff failed to timely move to strike the affirmative defense of contributory negligence. We need not determine whether plaintiff waived this issue by failing to move to strike the contributory negligence defense. Even assuming, 
arguendo
, that the argument is not waived, plaintiff’s argument fails on the merits, for, as we shall demonstrate, defendant did not violate the OSHA regulations on which plaintiff relies in failing to install a guardrail above the retaining wall.

The parties first dispute the applicable standard of review. Defendant maintains that the trial court’s judgment should not be reversed absent an abuse of discretion, while plaintiff argues that we should apply 
de novo
 review. We agree with plaintiff. The determination of whether OSHA regulations apply to the area of the retaining wall, whether the FRA preempts those regulations, and whether OSHA is a safety statute under 45 U.S.C. §53 (1994) are questions of law. 
Woods v. Cole
, 181 Ill. 2d 512, 516 (1998) (applying 
de novo
 review to questions of law). Further, the underlying facts necessary to make these legal determinations are not in dispute.

We must first determine whether OSHA regulations apply to the area above the retaining wall. Under OSHA, each employer
(footnote: 2) “(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees” and “(2) shall comply with occupational safety and health standards promulgated under this chapter.” 29 U.S.C. §§654(a)(1), (a)(2) (1994). Standard 1910.23(c) of OSHA provides for the protection of “open-sided floors, platforms, and runways” on “walking-working surfaces.” 29 C.F.R. §1910.23(c) (1993). Specifically, in relevant part, it provides:

“(1) Every open-sided floor or platform 4 feet or more above adjacent floor or ground level shall be guarded by a standard railing (or the equivalent as specified in paragraph (e)(3) of this section) on all open sides except where there is entrance to a ramp, stairway, or fixed ladder. ***

* * *

(2) Every runway shall be guarded by a standard railing (or the equivalent as specified in paragraph (e)(3) of this section) on all open sides 4 feet or more above floor or ground level.” 29 C.F.R. §§1910.23(c)(1), (c)(2) (1993).

“Platform” is defined as “[a] working space for persons, elevated above the surrounding floor or ground; such as a balcony or platform for the operation of machinery and equipment.” 29 C.F.R. §1910.21(a)(4) (1993). A “[r]unway” is a “passageway for persons, elevated above the surrounding floor or ground level, such as a footwalk along shafting or a walkway between buildings.” 29 C.F.R. §1910.21(a)(5) (1993).

Plaintiff maintains that the area of the retaining wall is a “runway” or a “platform” in need of protection by a “standard railing.”
(footnote: 3) In
 General Electric Co. v. Occupational Safety & Health Review Comm’n
, 583 F.2d 61 (2d Cir. 1978), the court addressed whether the unguarded portion of the top of a “dip and bake” oven where workers performed occasional maintenance
(footnote: 4) on a circulation and exhaust motor was a “platform” within the meaning of section 1910.21(a)(4). The court concluded that the definition of a “platform” 
does not

“apply to every flat surface over four feet high upon which employees may some day stand while performing some task related to their employment and the operations of their employer. An elevated flat surface does not automatically become a ‘working space’ and a ‘platform’ merely because employees occasionally set foot on it while working. Had the authors of the regulation intended the term ‘platform’ to include every elevated flat surface upon which employees could alight, they no doubt would have forgone the opportunity to limit the definition by using the phrase ‘such as a balcony or platform for the operation of machinery and equipment.’ ”  
General Electric Co.
, 583 F.2d at 64-65.

The court, citing the canons 
noscitur a sociis
 and 
ejusdem generis
, noted that where specific words follow a general term, the specific words limit the application of the general term to things similar to those enumerated. 
General Electric Co.
, 583 F.2d at 65. The court adopted the definition of “platform” suggested by an administrative law judge that “applies ‘only to elevated working spaces, 4 feet or [more] above ground level, which are designed primarily for the operation of machinery and equipment and which require employee presence on a predictable and regular basis; and not to spaces where only occasional maintenance or repair work is performed,’ ” and held that the unguarded portion of the top of the oven did not fall within the definition of “platform.” 
General Electric Co.
, 583 F.2d at 65.

In 
Donovan v. Anheuser-Busch, Inc.
, 666 F.2d 315, 317 (8th Cir. 1981), the Secretary of Labor cited the defendant for a violation of standard 1910.23(c)(1) for failing to provide guardrails on the top surface of its “can-line” pasteurizers. Employees climbed fixed ladders to the top of the pasteurizers to perform such tasks as biweekly inspections of water “sprayheaders,” periodic repair of the “sprayheaders,” placement and removal of aluminum logs between different lots of cans of beer every shift, and intermittent inspection of the progress of the aluminum bars two to four times a shift as they pass through the pasteurizer. 
Donovan
, 666 F.2d at 318.

On review, the court rejected 
General Electric
’s use of the maxims of statutory construction to determine that the phrase “such as a balcony or platform for the operation of machinery and equipment” was a phrase of strict limitation. Instead, the court concluded that under a reasonable and commonsense interpretation of the phrase, it serves as an example or illustration of structures included in the definition of “platform.” 
Donovan
, 666 F.2d at 326-27. Therefore, noting that this interpretation is consistent with the purpose of OSHA, the court concluded that standard 1910.21(a)(4) “defines a ‘platform’ as a ‘working space for persons, elevated above the surrounding floor or ground’ and then provides an example to this definition.” 
Donovan
, 666 F.2d at 327, quoting 29 C.F.R. §1910.21(a)(4) (1993). The court further stated that the facts of the case, although materially different from those in 
General Electric
, come within the definition of “platform” set forth in that case in that employee presence on the top surfaces of the “can-line” pasteurizers occurs on a predictable and regular basis and is necessary to the operation of the “can-line” pasteurizer machinery and equipment. 
Donovan
, 666 F.2d at 328.

In 1984, the Secretary of Labor, recognizing the disagreement as to when an “elevated surface” constitutes a “platform,” issued an OSHA directive to clarify and define the “conditions and circumstances under which a ‘platform’ is deemed to exist, and where the requirements of 29 CFR 1910.23(c) apply.” OSHA Instruction STD 1–1.13 (April 16, 1984). According to the Secretary,

“1. Platforms are interpreted to be any elevated surface designed or used primarily as a walking or working surface, and any other elevated surfaces upon which employees are required or allowed to walk or work while performing assigned tasks on a predictable and regular basis (See 29 CFR 1910.21(a)(4) for definition of ‘platform’.)

2. Predictable and regular basis means employee functions such as, but not limited to, inspections, service, repair and maintenance which are performed:

a. At least once every 2 weeks, or

b. For a total of 4 man-hours or more during any sequential 4-week period (e.g., 2 employees once every 4 weeks for 2 hours = 4 man-hours per 4-week period).”

We conclude that the area above the retaining wall is not a “platform” within the definition articulated in either 
General Electric
 or 
Donovan
, or by the Secretary. The retaining wall is approximately 6½ feet above ground level at the southwest corner of the Rocket House, thus meeting one requirement of standard 1910.23(c). The retaining wall, however, is simply a wall that separates the upper yard from the lower yard. The evidence at trial indicates that the top of the retaining wall is not a “working surface” or, as interpreted by the Secretary of Labor, a “surface designed or used primarily as a walking or working surface.” Certainly, the wall was not designed primarily for the operation of machinery or equipment and does not require employee presence on a predictable and regular basis. The evidence failed to demonstrate that any employee, including plaintiff, performed work in the area above the retaining wall. Plaintiff testified that there was a red switch across from the east door of the Rocket House that he would occasionally throw to change the path of a train from the long-lead track to the short-lead track. After alighting from the train at the east door to the Rocket House, plaintiff would sometimes throw this switch and then enter the Rocket House. In addition, the closest switch to the retaining wall was a yellow switch 15 feet away and on the opposite side of the short-lead track. The job of throwing these switches does not occur in or near the area above the retaining wall. Plaintiff did not maintain that he performed any other type of work near the retaining wall, other than using the area occasionally as a walkway. When asked whether other employees worked in the area of the retaining wall, plaintiff replied, “No. I’m probably the only one that would ever have to walk along that wall because of the job I do with the engines.” Further, Dennis Mogan testified that the area above the retaining wall 
could
 be used by trainmen and maintenance workers as a walkway, but its use is unnecessary to the performance of their duties. The fact that employees occasionally use the area as a walkway does not transform it into a “platform” “merely because employees occasionally set foot on it while working.” 
General Electric Co.
, 583 F.2d at 564.

For similar reasons, the area is not a “runway,” 
i.e
., a “passageway for persons, elevated above the surrounding floor or ground level, such as a footwalk along shafting or a walkway between buildings.” 29 C.F.R. §1910.21(a)(5) (1993). The retaining wall was not designed to function as a passageway. It is not a walkway between buildings or the sole path between the Rocket House and the south end of the 47th Street Yard. Further, the evidence demonstrated that employees do not use this area as a passageway in the routine performance of their duties.

We hold that the area above the retaining wall is neither a “platform” nor a “runway.” Plaintiff does not suggest the area falls under any other OSHA regulation; therefore, we find that defendant did not violate OSHA by failing to install a guardrail above the retaining wall. Accordingly, it is unnecessary to determine whether OSHA is a safety statute under 45 U.S.C. §53 (1994) and, if so, whether the FRA has preempted OSHA regulations in this area. The trial court correctly denied plaintiff’s motion to bar evidence of contributory negligence.

III. Testimony of Eugene Holland

We return now to defendant’s appeal and final contention, namely, that the trial court erred in allowing Holland to testify that various governmental regulations, such as OSHA and the Code, were evidences of the standard of care. At a pretrial conference, the court, ruling on defendant’s motion 
in limine 
to “exclude any reference to OSHA at trial,” initially determined that the FRA preempted OSHA in the area of the retaining wall and neither OSHA nor the Code, by their own terms, applied to the area. Thus, plaintiff was not permitted to represent at trial that defendant violated OSHA or the Code. The trial court, however, reserved ruling on whether Holland could testify that OSHA and the Code were evidences of the standard of care. During trial, the court allowed such evidence, and Holland opined that standards promulgated by numerous governmental organizations recognize the necessity of a guardrail when there is a change in elevation.

Defendant first argues that Holland’s opinion was not properly disclosed pursuant to Supreme Court Rules 213(f) and (g) (177 Ill. 2d Rs. 213(f), (g)). Admission of evidence pursuant to Rule 213 is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. See 
Becht v. Palac
, 317 Ill. App. 3d 1026, 1036 (2000); 
Susnis v. Radfar
, 317 Ill. App. 3d 817, 828 (2000); 
Seef v. Ingalls Memorial Hospital
, 311 Ill. App. 3d 7, 22 (1999). Rule 213 provides, in pertinent part:

“(f) Identity and Testimony of Witnesses. Upon written interrogatory, a party must furnish the identity and location of witnesses who will testify at trial, together with the subject of their testimony.

(g) Opinion Witness. An opinion witness is a person who will offer any opinion testimony. Upon written interrogatory, the party must state:

(i) the subject matter on which the opinion witness is expected to testify;

(ii) the conclusions and opinions of the opinion witness and the bases therefor; and

(iii) the qualifications of the opinion witness;

and provide all reports of the opinion witness.

***

(i) Duty to Supplement. A party has a duty to seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party.

If a deposition of an opinion witness is taken, the witness’ testimony at trial will be limited to the opinion expressed therein, in addition to those opinions identified in answers to Rule 213(g) interrogatories.” 177 Ill. 2d Rs. 213(f), (g), (i).

Defendant maintains that, prior to trial, Holland opined that defendant violated OSHA and the Code by failing to install a guardrail above the retaining wall. However, Holland failed to state an opinion as to how a reasonable person would protect the area of the retaining wall, a reasonable standard of care, or a standard of care for railroads under FELA. As such, defendant maintains that Holland’s testimony went beyond his disclosed opinions and “severely prejudiced” and “unfairly surprised” defendant. We disagree. Although Holland never explicitly stated in his deposition or report that the safety standards promulgated by various organizations were evidences of a standard of care, he opined that the area above the retaining wall was an unsafe workplace because there was nothing to prevent falling over the change in elevation. Implicit in that opinion, and in his opinion that defendant violated OSHA and the Code, is the fact that these safety standards indicate a standard of care.

Further, the committee comments to Rule 213(g) explain that, “in order to avoid surprise, the subject matter of all opinions must be disclosed pursuant to this rule and Supreme Court Rule 218, and that no new or additional opinions will be allowed unless the interests of justice require otherwise.” 177 Ill. 2d R. 213(g), Committee Comments, at xxx-xxxi; see also 
Copeland v. Stebco Products Corp.
, 316 Ill. App. 3d 932, 938 (2000); 
Seef
, 311 Ill. App. 3d at 21. Defendant’s pretrial motion was a motion to bar 
any
 evidence of OSHA at trial. In response to that motion, the trial court granted defendant relief in part by refusing to allow Holland to testify regarding violations but allowing him to indicate that various standards recognize the necessity of a guardrail when there is a change in elevation. In fact, defendant was aware of plaintiff’s “fall-back” position and argued against the position at the pretrial conference. Thus, we agree with the appellate court that defendant was not surprised by Holland’s testimony. Defendant was aware of Holland’s position prior to trial and had ample time to prepare an objection or cross-examination.

Finally, defendant argues that Holland should not have been allowed to testify that OHSA and other safety standards indicate a standard of care because they are inapplicable to the area of the retaining wall. We have already determined that OSHA does not regulate the area above the retaining wall and need not determine whether the other standards mentioned by Holland apply because we find that admission of this evidence was not erroneous.

The admission of evidence is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. 
In re C.N.
, 196 Ill. 2d 181, 223 (2001);
 In re Estate of Hoover
, 155 Ill. 2d 402, 420 (1993). The appellate court, relying on 
Miller v. Chicago & North Western Transportation Co.
, 925 F. Supp. 583 (N.D. Ill. 1996), concluded that Holland’s testimony was not erroneous.

Miller brought an action pursuant to FELA against the Chicago & North Western Transportation Company (C&NW), alleging that C&NW was negligent, in part, in failing to protect its workers from falling into an 8- to 10-foot deep open maintenance pit. While employed by C&NW, Miller fell into the pit and suffered closed head injuries. Miller intended for his expert witness to testify that a reasonable person would have had protective guards around the open pit, and C&NW was negligent in failing to do so. 
Miller
, 925 F. Supp. at 585. C&NW filed a motion 
in limine
 to prevent Miller’s expert from testifying that it failed to comply with regulations promulgated by OSHA, the Melrose Park building code, and safety regulations published by American National Standards, Inc. (ANSI). C&NW argued that the testimony should be barred because all three standards were preempted by the actions of the FRA. 
Miller
, 925 F. Supp. at 584-85.

With respect to OSHA, the court determined that the FRA, through a 1978 policy statement, preempted OSHA regulations with respect to railroad inspection pits; therefore, Miller’s expert could not testify that C&NW was bound by OSHA regulations. 
Miller
, 925 F. Supp. at 587. The court, however, concluded that because “Miller’s FELA claim includes the burden of showing that C & NW did not act as a reasonable person would have under the circumstances,” Miller’s expert could “permissibly consider the OSHA regulations as relevant to what reasonable safety precautions are called for regarding open pits generally”; thus, the expert was allowed “to use OSHA’s standards as part of the basis for his opinion as to what a reasonable person would do to protect an open pit.” 
Miller
, 925 F. Supp. at 588. The court also stated that jury instructions would supplement its holding.

In 
Robertson v. Burlington Northern R.R. Co.
, 32 F.3d 408 (9th Cir. 1994), Robertson sued Burlington Northern Railroad Company under FELA after he sustained a hearing loss and tinnitus (ringing in the ears) while employed by the defendant. The district court admitted evidence of noise standards established by OSHA as some evidence of the defendant’s duty of care to be viewed in connection with other evidence in the case, but instructed the jury that the standards were not binding on the defendant and could not be used to establish negligence as a matter of law. 
Robertson
, 32 F.3d at 409. On appeal, the court held that admission of OSHA noise regulations was not error, as such evidence “may be admitted in an FELA case as some evidence of the applicable standard of care.” 
Robertson
, 32 F.3d at 410. The court also upheld the giving of a jury instruction which informed the jury that OSHA and other standards were not binding on the defendant. 
Robertson
, 32 F.3d at 411. See also 
Ries v. National R.R. Passenger Corp.
, 960 F.2d 1156 (3d Cir. 1992) (a violation of OSHA could be considered by a jury as evidence of negligence).

Here, Holland testified that various safety standards, including OSHA, recognize a change in elevation as a safety hazard. He opined that a change in elevation should be protected by a guardrail and mentioned the safety standards as evidence of what a reasonable person would do to protect the area of the retaining wall. Consistent with the trial court’s motion 
in limine
, Holland did not testify that defendant had violated OSHA regulations or any other safety standard. Further the jury was instructed that

“Reference has been made in this case to certain standards under the Occupational Safety and Health Act (OSHA), BOCA National Building Code, American National Standards, Inc. (ANSI), and the Chicago Building Code for the limited purpose of suggesting construction standards in certain industries of the United States. These standards are not binding on the defendant Metra in this lawsuit, but may be considered by you, along with all the other evidence in this case in determining whether or not Metra provided a reasonably safe place to work. The issue of negligence in this case must be determined by you based upon all the evidence submitted to you, and by applying the law as I have instructed you.”

As 
Miller
, 
Robertson
, and 
Ries
 indicate, these regulations are admissible as evidence of the standard of care in an FELA case, even though the regulations are not binding on defendant.

In addition, an expert must be allowed to testify regarding the basis for his opinion (
cf.
 
People v. Delgado
, 282 Ill. App. 3d 851, 860 (1996) (expert may reveal contents of material he reasonably relied upon to explain the basis of his opinion); 
Giraldi v. Community Consolidated School District No.
 62, 279 Ill. App. 3d 679, 690 (1996) (expert may testify to facts or data on which his opinion is based)), because an expert’s opinion is only as valid as the reasons that underlie it (see 
Aguilera v. Mount Sinai Hospital Medical Center
, 293 Ill. App. 3d 967, 974 (1997)). Holland’s testimony that “every safety standard *** recognizes a change of level as being a fault” was simply intended to support his expert opinion that defendant was negligent in failing to install a guardrail above the retaining wall.

III. CONCLUSION

We conclude that the trial court erred in instructing the jury pursuant to IPI Civil 1995 No. 30.21. The court should have instructed the jury pursuant to one of defendant’s proposed alternative instructions. However, this failure does not constitute reversible error. Further, even if the trial court instructed the jury on assumption of risk, it is not reversible error. The trial court did not abuse its discretion by refusing to instruct the jury that defendant was not an insurer of plaintiff’s safety. Holland’s testimony did not violate Rule 213 and was properly admitted as evidence of negligence. We hold that OSHA regulations do not apply to the area above the retaining wall and, therefore, the trial court correctly denied plaintiff’s motion to bar evidence of plaintiff’s contributory negligence. For these reasons, we affirm the judgment of the appellate court, which affirmed the judgment of the trial court.

Appellate court judgment affirmed.

FOOTNOTES
1:     
1
It is unclear whether this instruction was submitted to the jury. After deliberation, the trial court decided to give the instruction but later failed to read it to the jury. The instruction is, however, contained in the record although the record does not reflect whether the instruction was given, given as modified, refused, or withdrawn as other instructions offered by the parties indicate. Because the parties proceed, without discussion, on the assumption that the instruction was given, we will later address defendant’s argument that the instruction was improper. 

2:     
2
An “employer” is “a person engaged in a business affecting commerce who has employees, but does not include the United States or any State or political subdivision of a State.” 29 U.S.C. §652(6) (1994).

3:    
3
A “standard railing” is defined as a “vertical barrier erected along exposed edges of a floor opening, wall opening, ramp, platform, or runway to prevent falls of persons.” 29 C.F.R. §1910.21(a)(6) (1993).

4: According to a General Electric Company employee, he had performed maintenance work on the top of the oven four or five times during a period of 2½ years. 
General Electric Co.
, 583 F.2d at 62.